EDWARD CLEFFORD

*v.* -

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 23, 1907.*

1. CRIMINAL LAW—*when effect of State's attorney's remarks is the same as a comment on accused's failure to testify.* Where the State's attorney, in his opening statement in a murder case, refers to self-defense, and says, "I now challenge the defendant to take the witness stand and make that defense, for if you do I will put a noose around your neck and hang you," the effect of such remark, if the accused does not testify, is to violate the statute, the same as though the State's attorney had commented, afterwards, on the failure of defendant to testify.

2. SAME—*objection as to improper remarks of State's attorney may be waived.* If the attorney of a defendant on trial for murder enters no objection to a challenge to the accused by the State's attorney, in his opening remarks, "to take the witness stand" and make the defense of self-defense, threatening hanging as the result, but, on the other hand, expressly accepts the challenge, the error is waived, since the purpose of the statute is not to protect the accused against his own counsel.

3. SAME—*motive is not essential to constitute murder.* If the evidence in a murder trial shows, beyond a reasonable doubt, that the accused killed the deceased with malice aforethought, it is wholly immaterial what his motive was, or whether the evidence indicates the existence of any motive whatever.

4. SAME—*one who goes to trial knowing a juror is prejudiced, but without challenging him, cannot complain.* A defendant who knows, from the examination of a juror, that he has formed an opinion of the defendant's guilt which it will require evidence to remove, but who accepts the juror without interposing any challenge, cannot afterwards complain that the juror had prejudged his case and was prejudiced against him.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. T. N. GREEN, Judge, presiding.

Edward Clefford, plaintiff in error, was indicted by the grand jury of Peoria county for the murder of Isaac Clefford, and on that charge was tried at the January term,

1907, of the circuit court of that county. He was found guilty by a jury and his punishment fixed at death. Motions for a new trial and in arrest of judgment were overruled, and he was sentenced by the court to be hanged on February 25, 1907. The record is brought to this court for review by a writ of error, which has been made a *supersedeas*.

Isaac Clefford was the father of plaintiff in error. At the time of his death, on November 26, 1906, he was fifty-five years of age, and lived with his son Charles in a two-room cabin boat at Lancaster Landing, a point on the west bank of the Illinois river, in Peoria county, where boats passing up and down the river are loaded with coal. There is no village at that place, and the nearest residence in November, 1906, was about eighty rods away. The only habitations nearer were the cabin boat of the deceased above the landing and another cabin boat about three hundred yards below the landing, which was occupied by Albert Morris, a fisherman, and his family. The deceased was a coal miner and was employed in loading barges and filling boxes with coal. At Lancaster Landing the river runs in a northerly and southerly direction, and the boat in which the deceased lived had been taken out of the water and located on blocks on the bank between fifty and one hundred feet north of the landing, and within fifty feet, and to the north, of a grade six or seven feet in height, leading from the landing in a direction north of west to a coal mine about a half mile distant. The boat had been blocked up from the ground between two and three feet, and was placed with its front door to the west and with the back of the boat to the east and toward the river. The hull of the boat was two feet and four inches deep, and above that, upon the deck, the cabin was built. The front end of the deck extended beyond the cabin and was used as a porch, and a plank had been laid from the ground to the north-west corner of the porch upon which to enter the boat. The back room in the

cabin, next to the river, was used as a bed-room, and in this room were kept, among other things, a twelve-gauge breech-loading shot-gun belonging to the deceased, and loaded shells for the same, which latter were hung in a sack on the wall at the river end of the boat. Not far from the river, in the grade leading to the mine, scales had been placed. Under the scales there was an opening extending through the grade. This opening was twelve or thirteen feet in length, measuring the way the grade runs, and about five feet from top to bottom. A few days before the alleged murder occurred, plaintiff in error came to visit his father and brother. He was an unmarried man, twenty-two years of age, a laborer, and had spent several years of his life working by the month on farms in that vicinity. He remained until the day before the homicide, and during that time the relations between the father and sons appear to have been friendly. On the morning of November 24, 1906, Edward and his father started for Glasford, a small town a few miles away. That night about eight o'clock the father returned alone.

Charles Clefford is a fisherman, and early the next morning, after he and his father had eaten their breakfast, he went across the river to fish. Later, on the same morning, Sunday, November 25, 1906, Albert Morris and his son, Edward, a boy of sixteen, were at work piling nets on the river bank about fifty feet south of the grade and about one hundred feet from the Clefford cabin boat. Some time between nine and ten o'clock their attention was attracted toward the boat by the report of a gun. Edward Morris was working where he could see the front part of the boat through the opening in the grade beneath the scales. Looking up he saw Edward Clefford standing on the north-west corner of the boat with a gun in his hands. At the moment that Edward Morris saw Edward Clefford the latter placed the gun to his shoulder and fired, and then passed through the door in the front end of the cabin. He was gone but a few moments, when he came out, jumped off the porch and

disappeared. At this time the only persons in that immediate vicinity were Isaac Clefford, Edward Clefford, Albert Morris, and his son, Edward. Soon after the shooting occurred Edward Clefford was seen coming from the direction of his father's boat by one Andrew Wolschlag, about a mile and one-half north of Lancaster Landing. He was walking rapidly and passed within one hundred feet of Wolschlag and went on north, but did not speak to Wolschlag although they had been acquainted for several years. He was then going toward the Toledo, Peoria and Western railroad, which runs from that vicinity to the city of Peoria. Fifteen or twenty minutes after the shots were fired Morris and his son had occasion to go over the grade to pile some nets on that side. When they reached the top they discovered Isaac Clefford lying on the ground about fifteen feet in front of his cabin boat, with his face down, his feet pointing towards his boat and his head towards the west. He had been shot with a shot-gun and badly wounded in the back part of his head and neck. Dr. A. C. Barnes, of Glasford, was immediately summoned and it was about ten o'clock when he arrived. By that time Clefford had been taken into a shanty nearby. The doctor had him removed to his cabin boat and made an examination of the wound and found between two hundred and fifty and three hundred shot in the back part of his head, also a scar or wound across the side of his face that reached to the corner of his eye. The physician gave the wounded man a stimulant, to which he responded but slightly. He died at one o'clock in the morning of the following day as a result of the gunshot wounds. A post mortem examination showed that most of the shot had struck him around the base of the skull but that none of them had reached the brain. He was never fully conscious after he was found lying on the ground.

After the shooting had occurred, and before the arrival of Dr. Barnes, Charles Clefford returned home. He tes-

tifies that he then went into the boat and examined the shot-gun, which before that day had last been used on the preceding Thursday and had then been put away without any loads in it. On this occasion Charles "broke" the gun, observed that there were no shells in it, and then put his finger in the muzzle of the gun and thereby ascertained that it had been "freshly used." Several months prior to this time Isaac Clefford, in the cabin boat, had exhibited to his son Charles a considerable amount of money, consisting of bills and about ten pieces of gold.

Edward Clefford spent the evening and part of the night of November 25, 1906, in the city of Peoria, in company with one Robert Miller, in saloons and houses of ill-fame. He displayed a large roll of money to Miller, handed him $160 for safe keeping and loaned him $10 to spend. The next morning Edward Clefford was arrested by police officers in Peoria and $544.60 was found in his pockets. Of this, $5 was in gold, a small amount in silver and a large part of the remainder was in ten and twenty-dollar bills. The defendant stated to Miller, while in his company, that he had $200 or $300 which had been paid to him by a coal miners' insurance company on account of an injury sustained by him some years before.

In his opening statement counsel for the defendant advised the jury that the killing of the deceased by the accused was admitted and that self-defense was relied upon as a justification. Later in the progress of the trial, while discussing an objection made to evidence offered by the prosecution, the court, addressing counsel for the defendant, said he understood that the latter admitted the shooting, whereupon counsel so addressed responded, "Yes; but we say it was done in self-defense." No evidence was offered on the part of the defendant. The case went to the jury solely upon proof adduced by the prosecution.

The alleged errors relied upon are: (1) The State's attorney made improper remarks in his opening statement

to the jury; (2) the court erred in passing on objections to evidence offered; (3) the proof is fatally defective in that it failed to show any motive for the crime; (4) one of the jurors had prejudged the rights of the accused and was disqualified, wherefore the defendant did not have a fair and impartial trial.

GRANVILLE A. STULTZ, for plaintiff in error.

WILLIAM H. STEAD, Attorney General, and ROBERT SCHOLES, State's Attorney, for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

In his opening address to the jury the State's attorney made use of the following language: "I infer from the interrogatories asked by the defense touching your competency to sit as jurors in this case, that the defense in this case will be that of self-defense. I now challenge the defendant to take the witness stand and make that defense, for if you do I will put a noose around your neck and hang you." It is urged that for this reason the judgment should be reversed. Section 426 of chapter 38, Hurd's Revised Statutes of 1905, provides that the neglect of the defendant to testify shall not create any presumption against him, nor shall the court permit any reference or comment to be made to or upon such neglect. The effect of the remarks of the prosecutor was to impress upon the minds of the jury the fact that the defendant (by which term we designate Edward Clefford) could, if he so desired, be sworn and testify in his own behalf. In this case he did not so testify, and the words of the prosecutor above set out were calculated to cause the jurors to dwell upon the defendant's failure to testify precisely as though some comment upon or reference to that failure had been made after the close of the testimony. The defendant, however, did not object to the statement and was not content to leave the record in this respect

as it had been made by the prosecutor, but in response to the challenge above set out counsel for the accused, in his opening statement to the jury, said: "I accept your challenge, Mr. Scholes; we admit the killing, and our defense is self-defense." The statement that the challenge was accepted was an assurance to the jury from counsel for the accused that the latter would testify, and the effect of that statement upon the minds of the jurors, so far as directing their attention to the failure of the defendant to testify, was precisely the same as that of the words used by the representative of the People. Under these circumstances error cannot be insisted upon. The purpose of the statute is not to protect the defendant from his own attorney.

Complaint is made of the action of the court in admitting in evidence the shot-gun which the deceased owned in his lifetime, on the ground that there is no proof that it was used by the defendant in the commission of the crime. The evidence set out in the foregoing statement establishes circumstances tending to show that the defendant killed his father with this identical gun.

Harry Cominsky was called as a witness, and it is claimed by the prosecution that his testimony shows that about one o'clock P. M. on the day of the homicide the defendant made purchases in the Bell clothing store, in Peoria, and handed the clerk two gold coins in payment. This evidence was objected to on the ground that the witness did not sufficiently identify the accused. In view of the fact that the testimony of Miller and the police clearly and certainly shows that Edward Clefford, after he reached Peoria following the homicide, had several hundred dollars in his possession, we do not think Cominsky's testimony, even if improperly admitted, could have been harmful to defendant.

It is then urged that no motive for the commission of the crime is shown, and that for this reason the proof does not warrant the verdict. If the jury believe, from the evidence, beyond a reasonable doubt, that the defendant killed

the deceased with malice aforethought, it is wholly imma-
terial what his motive was or whether the evidence indicates
the existence of any motive whatever. *Farris* v. *People,*
129 Ill. 521.

It is finally argued that Frederickson, one of the jurors,
was not impartial; that he had prejudged the rights of the
defendant, and that for this reason the defendant did not
have that fair and impartial trial which he is guaranteed by
the laws. In support of the. motion for a new trial there
were filed therewith affidavits of William Partridge and
Robert Bennett, from which it appears that they were co-
employees with Frederickson in the factory of the Avery
Manufacturing Company, located in the village of Avery-
ville, in Peoria county; that on or about the 27th day of
November, 1906, a little less than two months before the
beginning of the trial of this cause in the circuit court, Fred-
erickson, in conversation with Bennett, in the presence of
Partridge, at the place of their employment, stated, in sub-
stance, that the defendant was guilty and should be hung
like a dog, and Partridge alone further states that Fred-
erickson also said that if he (Frederickson) were a member
of the jury which tried Clefford, he (Frederickson) would
hang him.

On turning to the examination of this juror in regard
to his competency we find that he stated, in response to in-
terrogatories propounded by counsel for the defendant, that
he had read about the case in the Peoria newspapers, which
purported to give the facts; that he had talked with more
than one person about the case; that from his reading and
conversations he had formed an opinion as to the guilt or
innocence of the defendant and that he had expressed that
opinion; that at the time of his examination he had an opin-
ion on that question "to a certain extent;" that nothing had
intervened to change the opinion that he first entertained,
but that he could give the defendant a fair and impartial
trial upon the evidence introduced in court. Upon further

interrogation he stated, however, that it would require evidence to remove the opinion which he then had, which was based upon what he had read and heard in regard to the case. In the continuation of his examination by counsel for the defendant this question was asked: "Notwithstanding the fact that you have an opinion as to the guilt or innocence of the defendant in this case which would require some evidence to remove, you say you could give the defendant a fair and impartial trial?" to which Frederickson answered, "Yes, sir," and this concluded his examination in reference to the opinion entertained by him and in reference to conversations theretofore had by him.

The examination of this juror discloses the fact that he did not fully comprehend the questions propounded. If his opinion could only be removed by evidence, then he could not try the case solely upon the evidence introduced in court. The material question, however, in the situation disclosed by this record, is, did he answer truthfully the questions propounded to him?—and there seems no ground for concluding that he did not. He testified that he had both formed and expressed an opinion, which he still entertained. Nothing in his examination is inconsistent with the affidavits of Partridge and Bennett. His answers seem to have been entirely frank. There is no indication that he concealed anything or that he did not correctly state the nature of the views which he then entertained, in so far as he was interrogated. His confusion or his inability to clearly understand the questions asked appears by the examination itself. He was not challenged, either for cause or peremptorily. If it be true that he had prejudged the rights of plaintiff in error and was not a fair and impartial juror these facts were fully disclosed by his examination, and in that respect this case is distinguished from cases relied upon by the defendant, in each of which it appeared that the juror had prejuded the cause and entertained views unfavorable to the party against whom the verdict was thereafter ren-

229 — 41

dered but that this fact was unknown to that party at the time the juror was sworn. As defendant interposed no challenge he is not now in a position to insist that a new trial should have been allowed on account of the prejudice of the juror. If he saw fit to have his case tried by a juror known to him to be prejudiced, a new trial should not be granted on account of the prejudice so entertained by that juror. *VanBlaricum* v. *People,* 16 Ill. 364; *Stampofski* v. *Steffens,* 79 id. 303.

We are satisfied that the jury were warranted by the evidence in finding the defendant guilty of the crime with which he was charged and that there appears in the record no error of which the accused can avail himself that could have affected the result. The judgment of the circuit court will therefore be affirmed.

The clerk of this court is directed to enter an order of this court fixing the period between nine o'clock A. M. and five o'clock P. M. of the 20th day of December, A. D. 1907, as the time when the original sentence of death entered in the circuit court shall be executed. A certified copy of that order will be furnished by the clerk of this court to the sheriff of Peoria county.                    *Judgment affirmed.*