**Peter Soens, Administrator, Appellant, v. The Chicago, Wilmington & Vermilion Coal Company, Appellee.**

## Gen. No. 5405.

1. NEGLIGENCE—*what not attractive nuisance.* In this case a claim was made that the defendant was liable upon the theory that it maintained upon its premises a dam, pond, etc., which constituted an attractive nuisance. A recovery, however, was not allowed.

2. NEGLIGENCE—*what not competent to establish.* Evidence of the absence of a railing upon a culvert is not competent as against

a defendant who is not in possession or control of such culvert.

3. CONTRIBUTORY NEGLIGENCE—*when minor may be guilty of.* A minor over the age of seven years may be guilty of contributory negligence.

4. ORDINARY CARE—*what required of child above eleven years of age.* A minor above the age of eleven years is required to exercise such care as a child of its age, capacity, experience and intelligence might reasonably be expected to use under similar circumstances as those which resulted in the injury in suit.

5. TRIAL—*when conduct of juror will not reverse.* An improper comment made by a juror out of court during the pendency of the trial will not reverse if such comment was proveyed by the improper conduct of the party seeking to avail thereof as ground for new trial; if such party had desired to avail of such improper comment he should have called the attention of the court thereto during the trial, in which case the trial court might properly have discharged the jury.

6. VERDICTS—*how cannot be impeached.* Affidavits of jurors as to the manner in which they arrived at their verdict are incompetent to impeach the verdict rendered by them.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of La Salle county; the Hon. EDGAR ELDREDGE, Judge, presiding. Heard in this court at the October term, 1910. Affirmed. Opinion filed March 16, 1911.

GEORGE E. GLASS, for appellant.

BOYS, OSBORN & GRIGGS and McDOUGALL & CHAPMAN, for appellee.

MR. JUSTICE THOMPSON delivered the opinion of the court.

This is an action in case brought by Peter Soens, administrator of the estate of his deceased son, Matthew F. Soens, against the Chicago, Wilmington and Vermilion Coal Company to recover damages for the death of plaintiff's intestate, alleged to have been caused by the negligence of the defendant.

The declaration avers that the defendant possessed and occupied certain tract of land for the purpose of mining coal through a shaft dug by it on said land, and maintained thereon houses, boilers and other ma-

chinery; that a natural watercourse runs across said land and discharged into the Vermilion river half a mile distant; that the defendant negligently erected a dam across said watercourse on its land causing a pond of water to be gathered of the length of 200 feet, of the width of 150 feet and of a depth of 18 feet; that the pond extended to the public highway, was located in a populous neighborhood and dangerous to the lives of a large number of citizens, and to the lives of a large number of children of tender years, incapable of exercising ordinary care, who passed by the edge of the pond upon a public highway on their way to and from school and who might be attracted thereto; that it was the duty of the defendant to remove said dam, yet the defendant permitted it to remain in such dangerous condition that the deceased, a child of tender years, incapable of exercising ordinary care, while on his way home from school was attracted thereto and fell into said pond and was drowned.

The second count contains the additional averment that there were rafts on the pond which it was the duty of defendant to remove and that the deceased by going upon the rafts was drowned. Another count has the further averment that it was the duty of the defendant to watch, guard and fence the pond. A verdict was returned in favor of the defendant upon which judgment was rendered and the plaintiff appeals.

The evidence shows that the appellee possessed about twenty-five acres of land upon which it operated a coal mine having the usual buildings appurtenant to the operation of a mine. The mine is situated about a quarter of a mile north of Heenanville, a small hamlet of about three hundred population. A railroad runs east and west across the property just south of the shaft and main buildings with a switch track running around the north side of the main buildings. Two small streams of water, one coming from the north, the other from a little north of east, unite on appellee's property north and west of the shaft and

buildings about five hundred feet south from appellee's north line and some six or seven hundred feet southwest from its northeast boundary. The stream formed by the union of the two flows southwesterly through a valley about two hundred feet wide with steep banks, towards the Vermilion River half a mile distant. A public highway runs north on the east side of the appellee's property, across the railroad, then northwest about eight hundred feet, then west on the north and northeast sides of the appellee's property. Several years prior to 1904, appellee built a dam across the valley about two hundred feet below the junction of the streams, making a pond of about an acre and a half in extent north and west of the shaft. Two arms extend from the pond: one north across the public highway running east and west on the north, and the other easterly across the highway that runs on the northeast of appellee's property. Each arm crosses the highway about 400 feet from the angle where the road turns directly west. Culverts are built in the public highway where it crosses these arms. The water in the north arm at the culvert is about eight feet deep; at the culvert over the east arm it is about three feet deep. Earth is graded over the culverts leaving the driveway over the culverts about twelve feet wide. The school house that the children from Heenanville attended, is situated about three quarters of a mile northwest of the coal mine. There are two public highways to the school from Heenanville, one the road that runs on the east side of the appellee's property, then northeast across the east arm, then west across the north arm and continuing on west about half a mile to a north and south road, then north half a mile to the school house; the other road runs west from Heenanville until it intercepts the north and south road that runs to the school house. A path also was sometimes used that ran across the appellee's land past some of its buildings over the dam, and near

the west side of the north arm to the highway that runs
west on the north side of appellee's property. This
path was used by miners coming from the north and
south to their work. The only places on the highway
from which the pond can be seen are where the arms
cross it; the land between the main pond and the road
on the northeast and north side of appellee's property
is covered with timber and shrubbery concealing the
pond except where the arms cross the road.

The deceased on July 9, 1904, was a bright boy
about eleven years and four months of age, of average
intelligence who had regularly attended school. On
that day he had been at school and on returning home
with other children followed the road south until they
came to the road that runs on the north side of ap-
pellee's property, then they followed that road east
until they came to some bars in a fence by the side of
the highway enclosing the appellee's land west of the
north arm of the pond. The deceased with other chil-
dren went through the bars and along the path on the
west side of the north arm of the pond, over the dam
and then east on the south side of the pond about 250
feet, where they found a raft about eight feet square
made of plank and a door of a box car floating on the
pond. Chris Redding, a boy a year older than Soens,
suggested that they take a ride on the rafts, and asked
Annie Blue, aged thirteen, and Alma Redding, his
·sister, aged nine, to get on the rafts with them. The
girls were afraid and objected and the danger of such
an adventure was discussed amongst the children at
that time. The decedent got on the door of the box
car and pushed it out into the pond with a pole; Chris
Redding got on the raft and pushed it out. The Red-
ding boy then came back to the shore with the raft
and Alma Redding, his sister, and Annie Blue were
persuaded to get on it with him. The raft with the
three on it was then pushed out into the pond fifteen
or twenty feet and the Soens boy came back with the

car door to where they were with the raft and persuaded the occupants of the raft to get on the car door, managed by him. In getting from the raft to the car door, the door was upset, and the boys and the Blue girl were drowned. The raft had been made by one of the miners for his own pleasure and had been on the pond about ten days. Other rafts had been made by some of the miners and placed on the pond before that time but they had been destroyed as soon as placed on the pond, by a miner who lived just west of the north arm of the pond, because of the danger to children, but the maker of the raft which the children got on had told the miner who destroyed the others that this must not be destroyed because it was made with company lumber.

It is contended that the court erred in sustaining objections to certain evidence offered in behalf of appellant. Appellant sought to prove that there was no railing to prevent any one from falling into the north arm of the pond off the culvert in the highway. This culvert was in the public highway some 500 feet from where the decedent got on the raft. It was under the control of the highway commissioners of the township and not of the appellee. The culvert or the absence of a railing from it did not have any connection with or in any way contribute to the death of the decedent. It would have been error to have admitted such proof.

Appellant also sought to prove by a witness that he had negotiated with appellee's manager with a view to having appellee donate a lot south of the mine shaft upon which a school house might be erected and thus have a school house in Heenanville. Such fact was irrelevant and had not the slightest connection with or bearing on the alleged cause of action. There was no error in the rulings on evidence.

It is also assigned for error and argued that the court erred in refusing instructions one and two and in modifying instructions three, four and six requested

by appellee. Instruction one assumes that the deceased was a child of tender years incapable of exercising any care or discretion, and states that if the jury believe certain facts to be proved, many of which are totally at variance with plaintiff's evidence, then the jury should find for the plaintiff. This instruction was based on the plaintiff's theory, that on which the declaration was drawn, that the decedent was a child so young that the law conclusively presumes that he was incapable of contributory negligence. The law seems to be settled in this state that such presumption is not applicable to children over the age of eleven years; above that age it is a question of fact to be submitted to the jury whether they were exercising such care as a child of their age, capacity, experience and intelligence might reasonably be expected to use under similar circumstances. Chicago City Ry. Co. v. Tuohy, 196 Ill. 410; Perryman v. Chicago City Ry., 242 Ill. 269; Chicago City Ry. v. Wilcox, 138 Ill. 370. The instruction is involved, argumentative, and takes away from the jury the question of whether the facts stated constitute negligence on the part of the appellee. It was properly refused.

The second refused instruction starts out by informing the jury that it is not necessary for plaintiff to prove, and then states "on the contrary it is sufficient if the jury believe" certain things, but makes no reference to the fact that the boy was required to use such care as a boy of his age, capacity, intelligence and experience might reasonably be expected to use under similar circumstances. Clearly it would have been error to give it as asked.

The third and fourth instructions said that if the jury "believed from a preponderance of the evidence that the deceased exercised such a degree of care and caution as persons of his age, capacity and experience might reasonably be expected to naturally and ordinarily use under the circumstances in which he was

placed,'' etc. The court inserted the word ''intelligence'' after the word capacity. This statement of the law has been approved. Lake Erie & Western R. R. Co. v. Klinkrath, 227 Ill. 439; Star Brewery Co. v. Hauck, 222 Ill. 348; Wabash Ry. Co. v. Jones, 121 Ill. App. 390. The modification in the sixth instruction was in erasing the words ''or boats'' where the instruction referred to ''rafts or boats'' and also the phrase ''as alleged in plaintiff's declaration.'' We see no error in the modifications.

The only complaint made concerning the appellant's given instructions is that they ''ignore the principle of law that a child of tender years incapable of exercising ordinary care is only required to use so much care as one of his age would naturally and ordinarily exercise under the same circumstances, and nowhere announces the law applicable to the facts.'' Appellant does not refer to any particular instruction or point out what instructions he claims to be erroneous. The only instruction in the record asked by the appellee on that question is the tenth which states that ''the degree of care and caution required of deceased, was such a degree of care and caution as a boy of the age, capacity and experience and intelligence of the deceased would naturally exercise under the circumstances.'' This correctly states the law as laid down in the cases cited *supra*.

It is also contended that a new trial should have been granted because it is alleged one of the jurors was prejudiced against appellant and had expressed an opinion about the case during the trial. After the verdict was returned appellant in support of his motion for a new trial made an affidavit that one of the jurors, on his *voir dire* examination, answered that he knew the attorneys in the case and they all looked alike to him; that he had no bias and while he had heard about the case, he had expressed no opinion and would give the parties a fair trial; that on the trial the juror appeared interested in the defendant's side

and appeared indifferent to what was said on plaintiff's side; that during the time of the trial the juror and plaintiff returned to their homes in Streator each evening; "that on one of such occasions they (affiant and the juror) happened to be close together and were speaking about said cause and this affiant's prospect of winning the same" whereupon the juror said: "If you had employed a good lawyer you would have won your case." The attorney for appellant also filed his affidavit that the juror appeared prejudiced during the trial in favor of one or the other of the parties, but which one he could not tell.

The appellant appears from his own affidavit to have approached the juror during the trial and undertaken to interview and talk with him about the case and his prospect of winning it. While the statement of the juror was censurable, yet it was brought about by appellant, and was a rebuff to him for his very censurable and improper conduct which would seem to savor of an attempt to tamper with the jury. This contention is an attempt to take advantage of his own misconduct. Had this matter been called to the attention of the court forthwith during the trial, the court properly would have discharged the jury from the further consideration of the case. Appellant chose to proceed with the trial and take his chance of getting a favorable verdict and hold in reserve the complaint he now makes if the verdict should be unfavorable. Having chosen to conceal such improper conduct on the part of himself and the juror and proceed with the trial, it is too late to raise the objection he makes for the first time on a motion for a new trial. Stampofski v. Steffens, 79 Ill. 303; Clefford v. People, 229 Ill. 633; North Chicago St. Ry. Co. v. Burgess, 94 Ill. App. 337.

It is also insisted that the verdict was arrived at by an improper method. An affidavit of a juror was filed showing that the jury balloted a number of times; that the first ballot was six to six and then there were

several seven to five and then it was agreed that a majority should rule; that the next ballot showed a majority for the defendant and then the jury voted unanimously not guilty.

The rule is firmly established that affidavits of jurors, as to what transpired while considering of their verdict, will not be received to impeach such verdict as returned into court. This rule is founded on public policy and any misconduct of the jury while deliberating concerning their verdict must be established by other evidence. For the same reason that the affidavit of a juror is not admissible any statement made by him is not admissible, and a juror will not be permitted to make evidence by statements not under oath that he is not permitted to make under oath. City of Chicago v. Saldman, 225 Ill. 625; Heldmaier v. Rehor, 188 Ill. 458; Phillips v. Town of Scales Mound, 195 Ill. 353; Allison v. People, 45 Ill. 37. If verdicts could be impeached in such a manner but few verdicts would ever be returned that there would not be an attempt made to impeach.

The facts in this case are all peculiarly within the province of a jury and we find no error of law. The judgment is therefore affirmed.

*Affirmed.*