Thomas J. Kelly, Administrator, Plaintiff in Error, v. Chicago, Rock Island & Pacific Railway Company, Defendant in Error.

Gen. No. 5,552.

1. INSTRUCTIONS—*eliminating counts.* An instruction that no recovery can be had under. a certain count is proper, where even if it states a cause of action it is not supported by the proof.

2. DEATH—*evidence of knowledge of movement of trains.* Where plaintiff's intestate was killed through the alleged negligence of defendant in backing a train down on the wrong track without notice and from the evidence it appeared that the train was often backed down on such track; that under the regulations it might be so backed to the station on any day; that the deceased took the train in question every day and knew of the custom; that there were numerous lights on the back of the train; that it was moving at about two miles per hour and that an air whistle on the train and a crossing bell were sounding as the train approached, a verdict cannot be found for plaintiff on the theory that the train was backed on the wrong track and that plaintiff's intestate did not know it was coming on that track.

3. CARRIERS—*negligence.* Where one on a platform to take a train falls and her leg is caught in a truck of the approaching train, and after other attempts to release her have failed it is necessary to go some distance to secure tools to dismantle the truck, the result being that she was not released until about 55 minutes had elapsed, it cannot be said that the railroad employees did not do everything they could in the unusual emergency to release her, nor that tools should have been at hand to instantly dismantle the truck.

4. DEATH—*proximate cause.* No cause of action is shown by evidence that deceased, whose knee was caught in the truck of a railroad coach, was not removed in less than 45 or 55 minutes, where the medical testimony is that the injuries were sufficient to cause death even if deceased had been sooner released.

5. CARRIERS—*notice that train is coming on other than usual track.* Where one on a platform to take a train knows that it is coming on a track other than the usual one, such knowledge is sufficient notice.

6. CARRIERS—*when due care for jury.* On action for death resulting when plaintiff's intestate fell on a platform and was caught in the truck of an approaching train, it is for the jury to determine the question of due care; and a finding for defendant cannot be

Kelly v. Chicago, R. I. & P. Ry. Co., 175 Ill. App. 196.

disturbed where it seems that deceased knew of the approach of the train but the evidence is extremely conflicting as to whether she was struck by the train, or was attempting to board it while it was in motion or whether she slipped on ice on the platform.

7. JURY—*when party cannot complain of selection.* Plaintiff cannot complain concerning the selection of a jury where his peremptory challenges were not exhausted, and he voluntarily accepted all the jurors.

8. APPEALS AND ERRORS—*certificate of trial court.* It cannot be urged on appeal that jurymen were improperly selected from the city in which the accident occurred in violation of an agreement of counsel that jurymen therefrom should be excluded, where the certificate of the trial court does not show such an agreement or an intention to exclude jurors from such city.

9. APPEALS AND ERRORS—*when alleged improper acceptance of jurors waived.* Plaintiff cannot complain on appeal that jurors from the city in which the accident occurred were accepted in violation of an alleged agreement of counsel, where he knew as soon as the examination began that some were obtained in such city but did not object until after an unfavorable verdict.

10. APPEALS AND ERRORS—*when cannot be urged that order for jurors was exhausted.* Where the sheriff is ordered to summon twelve jurors and, on being ordered to bring six in soon, he summons six from the city in which the trial is held and later brings in twelve from nearby towns, it cannot be urged that the six jurors from the city were summoned after the order was exhausted, where the record does not show which jurors were served first.

11. APPEALS AND ERRORS—*when question not before court on appeal.* Alleged misleading answers of jurors on *voir dire* and the questions asked are not preserved in the record for appeal, where the certified bill of exceptions does not contain the question and answers except as they are embodied in an affidavit of plaintiff's attorney in support of a motion for a new trial, though the examination was in open court.

12. APPEALS AND ERRORS—*contents of record.* What occurs in open court in the presence of the trial judge and what is done by him is within his knowledge and cannot be made a part of the record by *ex parte* affidavits, but must be recited in the bill of exceptions, vouched for by the certificate of the judge.

13. APPEALS AND ERRORS—*making up bill of exceptions.* The trial judge may refresh his recollection as to what occurred at the trial, by examining the stenographers' notes, by recalling witnesses or jurors, or by receiving affidavits, but he must certify to the facts, and such facts can only be reviewed on his certificate as to what occurred.

14. APPEALS AND ERRORS—*presumption as to reasons for denial of motion for new trial.* Where a motion for new trial is denied after

the filing of an affidavit alleging that one party was misled by the answers of jurors on *voir dire*, it will be presumed that the judge, of his own knowledge, knew that the statements in the affidavit were untrue, or that their effect was obviated by other things which occurred in open court to the knowledge of the judge.

15. NEW TRIAL—*when affidavit defective.* An affidavit in support of a motion for a new trial is defective where some of the charges against a juryman are hearsay and the source of the affiant's information is not disclosed.

16. NEW TRIAL—*jurors' affidavits.* Jurors' affidavits are admissible to support their verdict.

17. NEW TRIAL—*jurors' affidavits.* Affidavits by jurymen will not be received to impeach their verdict, nor will affidavits be received as to statements by jurymen tending to impeach their verdict.

18. JURORS—*qualifications.* A conclusion that a juror was not disqualified and was not guilty of misconduct is warranted where the affidavits for new trial allege that such juror's brother worked for a company in which defendant's attorney is a stockholder, that when defendant's attorney was state's attorney the juror became involved in a certain difficulty but was not prosecuted, that two jurors complained of the arguments of such juror in the jury room and further that such juror stated that defendant's attorney had not been his attorney when he was so at that time; the juror's affidavits state that he did not know the defendant's attorney was such a stockholder, that his verdict was not thereby influenced, that he was under no obligation to such attorney as state's attorney, and showed no liability to criminal prosecution, that he met defendant's attorney on the street and asked him about a certain case and was told by the attorney that he would enter his appearance and if anything more happened he would see him again and that nothing further was ever done; and affidavits of seven jurors stated that such juror was not guilty of misconduct in the jury room.

19. NEW TRIAL—*when affidavit not ground for.* Where an affidavit of a witness of an accident shows that her testimony would be only cumulative and not decisive, it is not sufficient ground for new trial.

20. NEW TRIAL—*when new evidence insufficient to authorize.* Where deceased received injuries causing death when her knee was caught in the truck of a railway car, it being contended that she had slipped on ice on the station platform, a new trial, after verdict for the defendant, is not warranted because at the hospital a rubber overshoe was found on one of deceased's shoes but the other was not found and the family of deceased did not disclose such facts until after the trial, since lack of diligence was shown and

it does not appear that the overshoe would have had a decisive bearing on the verdict.

21. INSTRUCTIONS—*when notations on not harmful.* Notations on instructions indicating their subject-matter are not harmful where the trial court certifies that they were not present when the instructions were given and there is no proof as to who made them or when they were made.

Action in case for death by alleged wrongful act. Error to the Circuit Court of Will county; the Hon. CHARLES B. CAMPBELL, Judge, presiding. Heard in this court at the April term, 1912. Affirmed. Opinion filed October 15, 1912.

JOHN W. D'ARCY, for plaintiff in error.

SNAPP & HEISE, for defendant in error; M. L. BELL, of counsel.

MR. JUSTICE WILLIS delivered the opinion of the court.

For several years an accommodation train on the Chicago, Rock Island and Pacific Railway ran between Joliet and Chicago, and left Joliet at 6:40 A. M. each week day. During the night the train is stored at the Eastern Avenue yards, a half mile or more east of the depot in Joliet, and, before train time each morning, it is backed down to the depot to receive its passengers. At the depot the tracks run in an easterly and westerly direction. There are two main tracks, and the depot and platform are on the north side of said tracks. The depot is about 17 feet from the first track, and that intervening space is covered by a platform of two-inch plank which slopes two inches to the south in the distance of 17 feet. Passenger cars and their steps, on the north side of the north track, project six or eight inches over that platform and the step is about five inches above the platform. The space between the platform and the north rail is about twenty-two inches. The north track is the west-bound track, and the south track is the east-bound track. On the morning of December 16, 1909, this train was backed down to

the station platform from the Eastern Avenue yards, on the north or west bound track. The train reached the depot about 6:42 A. M. Katherine Ryan had been a constant passenger on this train each week-day for about three and a half years. She lived in Joliet about one mile from the depot, and was engaged in business in Chicago. There were many people to take that train that morning, including Miss Ryan, and many of them got out upon the platform and near the track as the train was backed in. Just before the train stopped, Miss Ryan fell upon the platform in some way about which the witnesses disagreed, and her left foot and leg, and some of her clothing, were drawn up between one of the western wheels of the westernmost car and the framework of the truck. Her knee passed beyond a certain bar, a part of the frame of the truck, and her foot and that part of her leg below the knee hung free, but her knee was crushed, and the soft tissues of her abdomen and left groin were severely lacerated, and it was found that the position of her knee beyond this bar, or equalizer, or spring, prevented her being removed. Several different expedients for releasing her were tried. The local physician of the railroad company was called and he administered remedies to stimulate her heart action and to relieve her pain. She was covered with a policeman's coat. Finally it became necessary to dismantle the truck in order to release her. From the time of the accident till she was removed from the truck was variously estimated at from 45 to 55 minutes. She was removed to a hospital and attended by several physicians, and died that evening. An administrator of her estate was appointed, who brought this action against the railway company to recover for the loss to her next of kin. Upon a jury trial there was a verdict for the defendant. A motion by plaintiff for a new trial was heard and denied, defendant had judgment, and plaintiff has sued out a writ of error to review the record.

The declaration contained eight counts. Plaintiff

dismissed the second count during the trial. The court instructed the jury that there could be no recovery under the third count, and properly so, for if it stated a cause of action it was not supported by the proof. There are two other counts, as to which it is at least doubtful if they state a cause of action; but it is sufficient to say of the declaration that it contained counts covering the main grounds upon which plaintiff contends he should have recovered. Plaintiff argues that the train was negligently backed down to the station on the wrong track and without notice to deceased; that defendant was guilty of negligence in failing to have at hand sufficient appliances wherewith to dismantle the truck promptly; and that the accident was caused by the negligence of defendant in permitting ice upon the platform, and in putting out the platform light at 6:30 that morning.

Defendant usually backed this train down upon the south track and, if it had done so, this accident could not have happened at that particular place. If it be held that a cause of action can arise from an unannounced change by a railroad company of the track upon which it runs a particular train, no such case for plaintiff was made here, for many reasons. There were two cases which might arise any day, under which the rules of the company required this train to be backed down to the station on the west bound track. There was another passenger train from the west due to arrive at and leave Joliet before this train left. If that train was behind time and had not passed when the time came to back this accommodation train down, but was near enough so that it must be allowed to pass before the accommodation train started, then it was the duty of those in charge of the accommodation train to back it down on the north track. There was also a rule of the road that if any train broke in two, the head of the train had a right to back down to the rear portion on the same track, and no other engine or train was permitted to go between. On the morning in ques-

tion a freight train going east on the south track broke in two west of Joliet, leaving the rear of its train there, and did not stop till after it had passed this accommodation train standing in the Eastern Avenue yards. Under those circumstances, the rule of the road required those in charge of the accommodation train to back down to the station on the north track, and that was why they did so on this particular day. But further, in the winter time it was a very common thing for the through passenger train, which should precede the accommodation, to be late and, by reason thereof, for the accommodation to back down to the station on the north track; and the proof is that for the two weeks in December preceding this accident, this train had backed down on the north track an average of four days in the week or two-thirds of the time. Deceased took this train every day and could not fail to know that for the preceding two weeks she had usually taken the train on the north track. More than all that, an engine, or train, was liable to be going west on the north track at any time and, if this train had backed down on the side track, deceased would not have been warranted in crossing the north track to reach it without first looking to see whether any train was approaching from the east on the north track. In fact, before the train reached the station platform, the speed had been reduced to about two miles per hour; there were two "blizzard" lights on the back of the train, which are the usual lights placed in that position; there was also a lantern on the rear platform of the train, showing a white light, and another lantern, showing a red light, and a railroad employee was on the back platform with still another lighted lantern in his hand. Another employee stood on the rear platform, holding in one hand an air brake, by which he could stop the train without any action by the engineer, and in the other hand an air brake whistle, which he was continuously sounding as he crossed Ottawa street, just east of the depot grounds, and came up to this station platform. Moreover, there

was a crossing bell at Ottawa street, which was ring-
ing. As the train nearly reached the place where de-
ceased was injured, the proof is that one of the men
on the rear platform of the approaching car concluded
that some of the women standing on the station plat-
form were too close to the train and called out to them
to get out of the way. The passengers and employees
who were witnesses all knew that this train was com-
ing on that track. An effort was made to show that
it was nearly dark, but we are satisfied from the evi-
dence that the jury were warranted in finding that it
was practically daylight, though somewhat foggy.
Witnesses for plaintiff testified that deceased was
looking directly at the coming train. We are of opin-
ion that the jury must have found from the evidence
that deceased saw this train and knew it was coming
on the north track. If she knew it was coming on that
track, no other notice was required. We are of opin-
ion that the jury could not reasonably have rendered
a verdict in favor of plaintiff, based upon the fact that
the train backed down on the north track.

Defendant's employees and others who assisted first
sought to release deceased by the use of jacks, but
those did not aid. Then they tried to raise or move
the bar which held her knee, by the use of iron levers,
but it was found impossible to get her knee past the
bar. They finally sent for tools and appliances some
distance away, with which they dismantled the truck.
One or two witnesses for plaintiff claimed this could
have been done in a very short time and with common
appliances which were at hand and which were not
used, but other witnesses claimed that this could not
have been done. It is clear that there was much ex-
citement at the train and that the railroad employees
were much puzzled to know how to proceed, and that
for some time it was confidently expected that in a
minute or two deceased would be released, and that
every person in charge did everything they could think
of and considered practicable. Plaintiff contends that

defendant should have had right there at the depot all the appliances necessary to instantly dismantle the truck. We cannot agree with this contention. Prob. ably such an accident never before happened in the operation of any railroad. Passenger cars are built to be run with great speed and, for the safety of the passengers, the trucks are necessarily made very strong and made so as not to yield to any ordinary blow or pressure. The trucks are not built to be readily dismantled, but exactly the opposite. We are of opinion that it must be held that in this sudden emergency, so different from any other within the experience of employees of defendant, they did everything they could do to extricate deceased from her position. But further, no cause of action in favor of plaintiff is shown by the evidence by reason of the fact that deceased was not more promptly released, for the medical testimony is that the injuries to her knee, thigh, abdomen, and groin, were sufficient to produce death, even if she had not been detained so long.

The witnesses for the plaintiff differed greatly in their testimony as to the cause of the accident. Some testified that deceased stood in line with the outer edge of the incoming car, and was struck by the step and knocked down. Others testified that she slipped and then was struck by the step. Others gave testimony tending to show that deceased reached up and apparently took hold of the first handle bar, and, as the train was still in motion, was thrown thereby or lost her hold. Others saw none of these things, but testified that as the nearest end of the approaching car came opposite her she slipped and went under the train. Her leg was not run over by any wheel. There was evidence that there was snow and ice on the platform. It was zero weather and there was fog or moisture in the atmosphere, and the proof was that all the sidewalks in the city were icy and slippery that morning. Deceased walked a mile to the depot and knew that fact. The snow had been swept off the platform be-

fore the day-men in charge of the platform left the preceding evening. It lay between the edge of the platform and the first rail. There was some snow upon the platform which had been tracked upon it, but the planks were in plain sight. As engines passed along during the night, they emitted steam from the valves which dripped upon the outer edge of the platform and froze there during the night. The men whose duty it was to keep the platform clear were not out at night, except in cases of emergencies, like storms, and they were not out the night preceding this accident, and they did not go on duty till seven A. M., and had not arrived when the accident occurred, and there was on the southernmost part of the platform such ice as had accumulated from engines passing during the night, and a part of the evidence for plaintiff tended to show that deceased slipped on this ice and fell because thereof. If plaintiff has any cause of action it is because of the presence of that ice. It was for the jury to determine from this conflicting evidence whether deceased was in the exercise of due care for her own safety in being so close to the approaching train as to be struck by the front end thereof, if she was so struck, or in attempting to get upon the car while it was in motion, under all these circumstances, if she did try to get on the car while it was in motion, or in being so close to the train while it was in motion that if she slipped she would fall under it; and also to determine whether defendant was in the exercise of the care which it owed to its passengers in not removing this ice during the night. We conclude that a determination of these questions of fact upon this conflicting evidence, with the approval thereof by the trial judge, cannot reasonably be disturbed by us under the evidence. We cannot say that the jury should have found that deceased was not in the line of the train and was not struck by the front step, and did not seize or attempt to seize the handle bar, and fell because the car was in motion, and

was in the exercise of due care in being at the place where she was while the train was in motion; nor can we say that the jury should have found that the ice was such that defendant was negligent in not having it removed during the night. We cannot say that the jury should have found that defendant was negligent in not having a light upon that platform at that time, since the proof warranted the jury in finding that it was practically daylight. The fact undoubtedly is that the passengers, including deceased, were in a great hurry to enter the train, and they carelessly went to a position very close to the coming car. It cannot be known with any certainty from this evidence whether the accident happened because deceased got too close to the train and was hit by the step and was knocked down, or whether she tried to get on the train while it was moving and got hold of the bar and lost her balance, or slipped on the icy platform as she was close to the truck. It may be that a verdict for plaintiff would have been sustainable by reason of the presence of the ice, but we see no ground upon which a verdict for defendant on this subject can be disturbed under this testimony.

Upon the motion for a new trial the plaintiff contended that the jury had been improperly selected. What occurred in open court on that subject can only be ascertained from the certificate of the trial judge, for reasons hereinafter stated. From that certificate it appears that the trial of this cause was begun in the afternoon of December 12, 1910; that there were but 16 jurors in the regular panel remaining and the court so advised counsel and they consented that 12 jurors be summoned from the body of the county; that plaintiff's attorney suggested that jurors ought not to be called from the court house or streets near by and defendant's attorney suggested that they should not be called from cigar stores and saloons. From affidavits it appears that 12 jurors were summoned to appear on the following morning from the towns of Wilmington,

Kelly v. Chicago, R. I. & P. Ry. Co., 175 Ill. App. 196.

Plainfield and Frankfort, each at some distance from the county seat; that during the afternoon, the jurors in the court room being nearly exhausted, the presiding judge told the minute clerk to tell the sheriff to have six of those jurors sent in soon, and that that direction was communicated to the sheriff. The latter sent men out into the city of Joliet and had six men brought in, and with those men the impanelment proceeded and 11 jurors were obtained that afternoon. On the following morning the 12 men from Wilmington, Plainfield, and Frankfort, appeared, and the first one of them called into the box was accepted as the 12th juror. Plaintiff now contends that it was the meaning and intention of counsel and the court that these jurymen should not be selected from the city of Joliet, and that these six, called on the afternoon of Monday, were brought in in violation of that understanding and order. The certificate of the court, to which we can alone look for what occurred in open court, does not show that the city of Joliet was excluded or was intended to be excluded from the territory within which the jurors should be obtained. "The body of the county" included the city of Joliet. But as soon as the examination of those six men began, plaintiff's attorney knew that they were obtained in Joliet, and if that was in violation of his rights, he should have made it known to the court at once and not have waited till an unfavorable verdict had been returned. Plaintiff argues on the assumption that before the sheriff summoned the six men from Joliet, he had already summoned the 12 men from Wilmington, Plainfield, and Frankfort, and his writ or order had been exhausted. We find nothing in the record to sustain this claim. For all that appears it may be that the six men in Joliet were the first ones served. It was several miles in different directions from the city of Joliet to the residences of the country jurors, and there is nothing to show when they were served, except that it was in time for them to be present in court

the following morning. If the men in Joliet were
served first, then they were in fact a part of the num-
ber whom the sheriff had been directed to summon
from the body of the county. No objection is urged
to the one juror who was selected on Tuesday morn-
ing out of the 12 men who were from the country. The
bringing in of 18 men when the written order was only
for 12, may have been caused by the fact that the
sheriff and his deputies had just taken office. The
sheriff seems not to have been advised that the six
men called for by the court, Monday afternoon, were
intended to be a part of the 12 called for by the origi-
nal order. Plaintiff did not exercise all his peremptory
challenges and voluntarily accepted the jurors who
tried the cause, and has no ground of complaint, under
People v. Gray, 251 Ill. 431; Hartshorn v. Illinois Val-
ley R. Co., 216 Ill. 392; Siebert v. People, 143 Ill. 571;
People v. Brown, 150 Ill. App. 365, and other cases
there cited.

Plaintiff contends that he was misled and deceived
by the answers of the jurors, Wood and Schultz, upon
their *voir dire*. The questions put to those jurors and
their answers thereto are not contained in the bill of
exceptions, except as they are embodied in one of the
affidavits made by plaintiff's attorney in support of
the motion for a new trial. There is no certificate by
the trial judge showing what occurred upon the exam-
ination of said jurors. The examination was in open
court on the trial of this cause. What is done by the
trial judge and what occurs in open court in his pres-
ence is within his knowledge and must be recited in
the bill of exceptions vouched for by his certificate,
and cannot be made a part of the record by *ex parte*
affidavits. If such a practice should be tolerated, then
on a motion for a new trial affidavits might be filed to
show what rulings the court made upon the evidence
and upon the instructions. If a trial judge does not
remember what occurred, he may refresh his recollec-
tion by examining the stenographer's notes, by recall-

ing witnesses or jurors, or he may receive affidavits, but, when his recollection has been refreshed, it is he who must certify to the fact, and such fact can only be reviewed upon his certificate as to what occurred. Indeed, if after the filing of such an affidavit for a new trial, the court denies the motion, it will be presumed in support of the action of the court, that the presiding judge, of his own knowledge, knew that the statements in the affidavits of what occurred in open court were untrue, or that their effect was obviated by other things which occurred in open court to the knowledge of the presiding judge. Mayes v. People, 106 Ill. 306; Peyton v. Village of Morgan Park, 172 Ill. 102; Deel v. Heiligenstein, 244 Ill. 239. We applied these principles in Holland v. People, 132 Ill. App. 449; Clark v. Hemmingson, 132 Ill. App. 619; Chicago, R. I. & P. R. Co. v. Ross, 136 Ill. App. 518; People v. Strauch, 153 Ill. App. 544. Our judgment in the latter case was affirmed in People v. Strauch, 247 Ill. 220. In that case an affidavit was filed, setting forth questions put to a certain juror and his answers and the denial of a challenge for cause. The Supreme Court said: "This question is attempted to be preserved in the record by an affidavit in support of the motion for a new trial. Under the authorities heretofore cited, these alleged occurrences, being shown only by affidavit, are not properly preserved for review here." Under the above authorities and other cases there cited, the questions propounded to these jurors and their answers thereto are not before this court, and it would therefore be impossible for us to determine whether such answers were full and candid or deceptive, and the judgment cannot be reversed on this record by reason of said supposed questions and answers. The showing on this subject made by the affidavit of plaintiff's attorney is defective in another respect. As to some of the charges made against the juryman, Wood, the affidavit contains hearsay only, unsupported by the affidavit of any one who knows the facts, and without

a disclosure of the source of the affiant's information. We conceive that a verdict cannot be set aside on hearsay, but that the alleged facts should have been shown by the affidavit of some one who would testify thereto of his own knowledge.

We, however, conclude to refer to the more important of the matters complained of. The affidavit in question stated that a brother of the juror, Wood, worked for a certain printing company, and that the affiant is informed and believes that one of defendant's attorneys is a stockholder in that company. Affidavits of jurors are admissible to support their verdict. City of Chicago v. Dermody, 61 Ill. 431. They were received and considered to support a verdict in Sanitary Dist. of Chicago v. Cullerton, 147 Ill. 385, 392. The affidavit of the juror, Wood, was filed for that purpose. He therein stated that he did not know that defendant's attorney was a stockholder in said company, and that he had not been on speaking terms with his brother for several years, and was not influenced in his verdict by any such consideration. The affidavit of plaintiff's attorney stated that, after the trial, he was informed that while one of defendant's attorneys was State's Attorney, the juror, Wood, was involved in a difficulty, the details of which affiant was not at liberty to disclose, and that the same was brought to the attention of said State's Attorney, and that Wood was not prosecuted, and that affiant believed that Wood was thereby put under obligation to the State's Attorney. The affidavit of the juror, Wood, stated the details of said matter, and showed nothing which could subject him to a criminal prosecution or put him under any obligations to the State's Attorney. The affidavit of plaintiff's attorney showed that several days after the trial, two of the jurors visited his office and apparently sought to explain their adverse verdict by complaining of the arguments by the juror, Wood, in the discussion of the cause in the jury room and by complaining that he talked loudly there. Not only

will affidavits by jurymen not be received to impeach their verdict, but also affidavits will not be received as to the statements made by jurymen after the verdict has been received and tending to impeach that verdict. If such statements to third parties were received, the unsworn statements of jurymen would be permitted to overcome their verdict, rendered under the solemnity of an oath. The admission of such statements would encourage the practice of tampering with jurymen after their discharge. The admission of such statements would furnish dissatisfied and corrupt jurors the means of destroying the verdict to which they had assented. Heldmaier v. Rehor, 188 Ill. 458; Phillips v. Town of Scales Mound, 195 Ill. 353; City of Chicago v. Saldman, 225 Ill. 625; Foley v. Everett, 142 Ill. App. 250; Soens v. Chicago, W. & V. Coal Co., 160 Ill. App. 467. Defendant, in support of the verdict, filed the affidavits of seven jurors and by them showed that the juror, Wood, was not guilty of any breach of duty or lack of decorum in the jury room, and also showed that the verdict was the result of a careful consideration of the verdict and a full deliberation. The principal contention as to the juror, Wood, in the affidavit of plaintiff's attorney is that he asked said juror if one of the attorneys for defendant had been his attorney, and that he answered "No," whereas said attorney was the attorney of the juror, Wood, at that time in a suit then pending in the County Court. The affidavit of the juror, Wood, showed that he had been sued by one Hiney, before a justice of the peace, for a small sum which he denied that he owed; that he employed one Morrill Sprague, an attorney of the Will County bar, to defend him, and after repeated continuances Sprague procured the dismissal of that suit for want of prosecution; that Hiney then sued him again before another justice and Sprague defended him and procured the dismissal of that suit for want of prosecution; that Hiney then sued him in the County Court, and he tried to find

Sprague and failed, and did not know what advantage might be taken of him in the County Court, and met one of defendant's attorneys on the street and told him about it and asked him if anything could be done to harm him, and said attorney replied that he would enter his appearance for Wood and if anything came of it, Wood could see him again, and that nothing further had ever been done about the case. It was made to appear that defendant's attorneys did file the written appearance of Wood in said case, and that on the day that this trial was completed the county judge called one of said attorneys into the County Court and the case was thereupon continued. In his affidavit, the juror, Wood, stated that said attorney had never been employed by him in any case and that he did not consider what was said between them on the street an employment, and he had paid him nothing and had never consulted him as an attorney, except in said conversation on the street. He further stated that said attorney had been employed for a debtor against whom he had a claim, and against whom he represented other claims; and he had been in the office of said attorney to adjust said claims wherein said attorney represented the opposite side from himself. He further stated that he had always been on good terms with the attorneys for both sides and that, not very long before this trial, he had business transactions with plaintiff's attorney concerning certain real estate deals, in which both plaintiff's attorney and himself made a profit; and that in political matters he had sometimes supported plaintiff's attorney and sometimes defendant's attorney. It further appeared that Wood had never served on a jury before; that he had business engagements connected with the coming Christmas season which would result in his suffering serious financial loss if he served as a juryman in this case, and that he did everything he could think of to get excused, and that if he had realized that his talk with defendant's attorney on the street constituted the lat-

ter his attorney, he would have been very glad to take advantage thereof and secure a dismissal from the case. We are of opinion that the trial judge was warranted in concluding that the juror was not disqualified by the facts above stated and was not guilty of any misconduct. As to the juror, Schultz, we think it sufficient to say that the affidavit of plaintiff's attorney shows that on his examination he disclosed the fact, which, of course, was known to plaintiff's attorney, that plaintiff's attorney had three suits pending against his employer. Plaintiff had not exhausted his peremptory challenges and saw fit to take the juror, notwithstanding that disclosure. Schultz also had never served as a juror and was exceedingly anxious to avoid service. He was in fact a registered pharmacist, but did not claim an exemption on that account till after he had been accepted by both sides and the court then refused to excuse him. When all the affidavits are considered, it is a just conclusion that the jury rendered a conscientious verdict after due deliberation.

Miss Helen Maher was on the station platform at the time of this accident, intending to take passage on said train, and she was not called as a witness, and a new trial was sought on the ground that the testimony which she would give was newly discovered evidence. Her affidavit shows that she would corroborate some of plaintiff's witnesses and contradict others. It contained no new matter, but was merely cumulative and not decisive, and on familiar principles was not a sufficient ground for granting a new trial. At the hospital a rubber overshoe was found on one of the shoes of deceased and the other rubber was not found. This rubber overshoe was placed in the possession of the family of deceased, the beneficiaries in this suit, a few days later. They did not disclose the facts about it to their attorney till after the trial of the suit. This would not warrant a new trial, both because of a lack of diligence on the part of the beneficiaries in failing

to bring forward this evidence on the trial, and also because it does not appear that the existence and condition of said rubber overshoe would have had any decisive bearing on the verdict.

Many of the instructions, as they appeared in the original record in this case, contained on their margin catch words, tending to indicate briefly the subject-matter of the instruction. The bill of exceptions made it appear that the judge gave those instructions with those notations upon them. Plaintiff's brief here argued that those notations constituted reversible error. The existence of those notations was unknown to the trial judge and evidently to defendant's attorneys until said brief was filed here. A continuance was then obtained and an application was made to the trial judge to amend the bill of exceptions, and there was a hearing, and the bill of exceptions was amended by striking out all said notations, and it was found and certified by the trial judge that said notations were not upon the instructions when the instructions were given to the jury. Said amendments were shown here by a supplemental record. There is no proof who made those notations nor when they were made. They were probably made by the jurymen in their discussion in the jury room. They were not harmful in their character.

Plaintiff contends that defendant's instructions were improper, and that too many of them end by a direction to find the defendant not guilty, and that some instructions ignore some issues. We have examined the instructions complained of and find that each states a condition which, if found by the jury to exist, would require a verdict of not guilty, regardless of other issues. The case went to the jury on six counts of the declaration, stating many different grounds of liability, and defendant had a right to an instruction to meet each of those contentions. Each instruction which directed a verdict of not guilty, was so qualified as to be correct. Complaint is made of

instruction No. 14, given at defendant's request, which stated that it was the duty of defendant to back this train far enough west so that passengers could take the train at the station platform and not to stop at Ottawa street and compel the passengers to go there to get on. That this was the duty of defendant is apparent from sections 1 and 2 of the Act of May 23, 1877, compelling railroad companies to build and maintain depots, and also from sections 22 and 23 of the act in relation to fencing and operating railroads. The instruction was made necessary by testimony introduced by plaintiff to the effect that defendant could have stopped this train at Ottawa street or east thereof to receive passengers.

We find no reversible error in the record. The judgment is therefore affirmed.

*Affirmed.*